1  MARC J. FAGEL
   MICHAEL S. DICKE
2  MARK P. FICKES (Conditionally Admitted Pursuant to G.R. (2)(c)(2))
     fickesm@sec.gov
3  JASON M. HABERMEYER (Conditionally Admitted Pursuant to G.R. (2)(c)(2))
     habermeyerj@sec.gov
4
   Attorneys for Plaintiff
5  SECURITIES AND EXCHANGE COMMISSION
   44 Montgomery Street, Suite 2600
6  San Francisco, California 94104
   Telephone:  415-705-2500
7

8                    UNITED STATES DISTRICT COURT

9                WESTERN DISTRICT OF WASHINGTON

10                         AT TACOMA

11

12  SECURITIES AND EXCHANGE COMMISSION,    Civil Action No. _____

13              Plaintiff,
                                           COMPLAINT
14       vs.

15  KARLHEINZ REDEKOPP,

16              Defendant.

17

18       Plaintiff Securities and Exchange Commission ("the Commission") alleges:

19                       **SUMMARY OF THE ACTION**

20       1.      This case involves a financial reporting fraud committed by defendant Karlheinz

21  Redekopp, the former Chief Financial Officer of International Commercial Television, Inc.

22  ("ICTV" or the "Company"), a marketer of health and beauty products headquartered in

23  Bainbridge Island, Washington.  From February 2007 to June 2008, Redekopp fraudulently

24  recognized revenue and incorrectly recorded product returns, causing ICTV to materially

25  overstate revenue and net income in periodic reports filed with the Commission during a six-

26  quarter period.  Collectively, ICTV overstated revenue and net income by $3.7 million and $3.9

27  million, respectively.  As a result of the fraud, ICTV reported net income for each fiscal period,

28  when in reality the company had suffered net losses.

2.     In 2007, ICTV forged a new and important relationship with the Home Shopping Network ("HSN"), a nationally recognized televised shopping network. From the inception of the relationship through June 2008, Redekopp prematurely and fraudulently recognized revenue on at least eight purported sales to HSN totaling $3.9 million, violating the Company's own accounting policies as well as numerous revenue recognition criteria under Generally Accepted Accounting Principles ("GAAP").

3.     Redekopp's improper accounting for HSN sales was driven by a motivation to bolster ICTV's quarter-end and year-end sales numbers. Of the eight HSN orders improperly recognized as revenue by Redekopp, at least three sales totaling $3 million were recognized on or close to the last day of the period. In another instance, Redekopp caused ICTV to recognize a "sale" to HSN near the end of 2007 for a product that had not passed HSN's quality control testing and was never sold.

4.     Redekopp also failed to properly recognize revenue and returns on sales made directly to end users via infomercials produced by the Company. Among other failures, Redekopp improperly recognized revenue on these sales prior to expiration of a free trial period in violation of GAAP, failed to establish a return allowance, and significantly underreported actual returns ICTV received.

5.     The Commission seeks an order enjoining Redekopp from future violations of the securities laws, requiring him to pay a civil monetary penalty, and barring him from serving as an officer or director of a public company.

## JURISDICTION AND VENUE

6.     The Commission brings this action pursuant to Section 20(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b)] and Section 21(d) of the Securities Exchange Act ("Exchange Act") [15 U.S.C. §§ 78u(d)].

7.     This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(e) and 78aa]. Redekopp, directly or indirectly, has made use of the means and instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities

-2-

1  exchange, in connection with the acts, practices and courses of business alleged in this

2  complaint.

3       8.      Venue is proper in this District pursuant to Section 22 of the Securities Act [15

4  U.S.C. § 77v] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Certain of the

5  transactions, acts, practices and courses of conduct alleged herein occurred within the Western

6  District of Washington.

7       9.      Assignment to the Tacoma Division is appropriate pursuant to Local Rule 5(e)(1)

8  because a substantial part of the events that gave rise to the claims alleged herein occurred in

9  Kitsap County.

10                              **DEFENDANT**

11      10.     Karlheinz Redekopp, age 40, resides in Vancouver, Canada.  At the time of the

12  events alleged herein, Redekopp served as ICTV's Chief Financial Officer.  Redekopp resigned

13  from ICTV in August 2008.

14                            **RELEVANT ENTITY**

15      11.     International Commercial Television, Inc. is a Nevada corporation headquartered

16  in Bainbridge Island, Washington.  The Company's common stock is registered with the

17  Commission under Section 12(g) of the Exchange Act [15 U.S.C. §78l].  ICTV sells health and

18  beauty products internationally via infomercials and through various televised shopping

19  networks.

20                          **FACTUAL ALLEGATIONS**

21  **A.  Background and Applicable Revenue Recognition Policies**

22      12.     According to the Company's SEC filings, ICTV is a marketer of consumer

23  retail goods, specializing in "fountain of youth" health and beauty products it owns or holds

24  the right to sell.  The Company's best-selling product is the Derma Wand, a skin care

25  appliance that, according to ICTV's SEC filings, purportedly "reduces fine lines and wrinkles

26  and improves overall skin appearance."

27      13.     ICTV sells product through two main channels:  (1) direct sales to end users

28  via infomercials produced by the Company ("direct sales"), and (2) distribution through third-

1  party distributors for sell-through to end users ("sell-through sales"). ICTV's distributors

2  include televised shopping networks such as HSN.

3      14.     As a public company, ICTV's financial statements filed with the Commission are

4  required to be prepared in accordance with GAAP. As ICTV's CFO, Redekopp was responsible

5  for certifying, among other things, that these financial statements were prepared in accordance

6  with GAAP.

7      15.     Under GAAP, revenue must be realized or realizable and earned before it can

8  be recognized. GAAP guidance provides that revenue generally is realized and earned when

9  persuasive evidence of an arrangement exists, delivery has occurred, the seller's price is fixed

10  or determinable, and collectibility is reasonably assured.

11      16.     GAAP also provides that, when a right of return exists, revenue cannot be

12  recognized at the time of sale unless, *inter alia*, the amount of future returns can be

13  reasonably estimated and an offsetting allowance established.

14  **B. Redekopp Improperly Recognized HSN Revenue Prior to Sell-Through or Delivery
     to End Users**

15

16      **1.  The HSN Relationship**

17      17.     In 2007, ICTV signed a contract with HSN, one of the top-grossing television

18  shopping networks in the United States. This alliance with HSN helped to promote ICTV's

19  product and brand awareness, increasing ICTV's reported net sales by 97% over year-end 2006.

20  In total, during 2007, ICTV's reported net sales, including HSN sales and direct sales, increased

21  by 280% from 2006.

22      18.     Under the terms of the initial contract, HSN issued a purchase order, retrieved

23  the product, sold the product to end users, and paid ICTV after the sell-through. HSN had the

24  right to return any unsold product, or any product returned to HSN by HSN's customers (*i.e.*,

25  the end users) within a specified period of time.

26      19.     However, only the first HSN sale was made per the terms of the contract

27  described in paragraph 16, above. All other HSN sales were made through a "drop-ship"

28  contract entered into between ICTV and HSN in or about May 2007. Under the drop-ship

1   contract, which Redekopp signed on ICTV's behalf, HSN did not purchase the product itself,

2   but instead facilitated sales to end users.  Generally, HSN sent ICTV written requests to pre-

3   order product that would be sold during future HSN television broadcasts.  ICTV stored the

4   product at ICTV's third-party fulfillment warehouse until HSN sold the product on the air.

5   After HSN sold the product to its customers, ICTV's warehouse shipped the product to the

6   HSN customers, and HSN subsequently sent payment to ICTV.  ICTV retained title to the

7   product until the product was sold and shipped to the end users.  HSN did not guarantee the

8   purchase of any product, and any unsold product remained under the ownership of ICTV.

9   The contract also allowed HSN to return any product from its customers up to 60 days after

10   delivery to the customer.

11          **2.    Redekopp Failed to Ensure Sell-Through Had Occurred Prior to Revenue**
              **Recognition**

12

13          20.     From the first quarter of 2007 through the second quarter of 2008, Redekopp

14   prematurely recognized revenue on ICTV's sales to HSN, before HSN sold through to its

15   customers and before the right of return expired, in violation of GAAP.

16          21.     In February 2007, ICTV received a preliminary order worksheet from HSN for

17   1,799 Derma Wand units, to be sold under the terms of the contract described in paragraph 14,

18   above, for approximately $89,000.  The three-page document stated in large, bold type across

19   the top of each page:  **"This is not a purchase order!"**  Although HSN had not yet issued a

20   final purchase order or sold the product on the air to its customers, Redekopp caused ICTV to

21   recognize the Company's first HSN "sale" for the full $89,000 during the first quarter of

22   2007.  HSN did not issue a final purchase order for the 1,799 units – and did not sell any

23   product to its customers or pay ICTV for any such sales – until the following quarter.

24          22.     In the second quarter of 2007, HSN began to issue drop-ship requests.  Despite

25   knowing that HSN did not itself purchase the product and that any payment to ICTV was

26   contingent on HSN's sell-through to end users, Redekopp recognized revenue on or about the

27   date of the HSN requests, for the full amount stated in each request.

28

1    23.    Redekopp failed to ensure that, by the end of each quarter, HSN had sold through

2    the units for which revenue was recognized during that period.  For example, on June 12 and

3    June 15, 2007, Redekopp recognized revenue for 10,000 Derma Wand units collectively totaling

4    nearly $500,000.  Yet by quarter-end, HSN had sold just 2,400 units for less than $120,000.  As

5    a result, ICTV reported revenue to investors for sales which had not been completed that

6    quarter.

7    24.    Redekopp's accounting of HSN sales violated revenue recognition criteria

8    under GAAP.  Delivery of the goods had not occurred prior to revenue recognition.

9    Collectibility of the receivable was not reasonably assured, given that product had not been

10   sold through and HSN had the right to return any unsold product.  And, with respect to drop

11   ship sales through HSN, there was no persuasive evidence of an arrangement, as HSN had not

12   sold through to its customers at the time Redekopp recognized the sales, and ICTV retained

13   ownership of any unsold product.

14   25.    Redekopp's accounting also violated ICTV's revenue recognition policy,

15   which Redekopp drafted and which generally mirrored GAAP requirements.

16   26.    Redekopp knew that ICTV would not be paid by HSN until sell-through, that

17   HSN had the right to return the product, and that ICTV retained ownership of any unsold

18   product.

19   **3.    Redekopp Deliberately Recognized Revenue to Boost ICTV's Bottom Line**

20   27.    Redekopp's accounting treatment was driven in part by a motivation to improve

21   ICTV's sales numbers at the end of accounting periods.  Specifically, of the eight HSN orders

22   improperly recognized as revenue by Redekopp totaling $3.9 million, at least three sales totaling

23   $3 million were recognized on or close to the last day of the period.  Additionally, Redekopp

24   caused ICTV to recognize revenue on a product that later failed HSN's quality control testing

25   and was never sold.

26   ///

27   ///

28   ///

1 | *The September 30, 2007 Transaction*

2 |      28.    In the third quarter of 2007, Redekopp recognized a 20,775-unit sale for

3 | $1,028,000 on the last day of the quarter when virtually none of these units had been sold

4 | through.

5 |      29.    As a result of Redekopp's fraudulent accounting for the September 30, 2007

6 | transaction, ICTV overstated net sales by 46% for the quarter on originally reported net sales

7 | of $3.2 million.  In addition, ICTV's originally reported net income of approximately

8 | $584,000 for the period was restated to a net loss of approximately $136,000.

9 | *The November 2007 CellRx Transaction*

10 |      30.    In the fourth quarter of 2007, Redekopp recognized revenue for the "sale" of a

11 | product that failed an HSN quality control inspection and was never actually sold to end

12 | users.  The receivable remained on ICTV's books until after Redekopp's resignation in

13 | August 2008.

14 |      31.    In November 2007, ICTV received a preliminary order worksheet from HSN

15 | to purchase 3,500 units of a new product called Cell Rx.  Once again, even though HSN had

16 | not issued a final purchase order or sold any product to its customers, Redekopp recognized a

17 | $94,000 "sale" in the fourth quarter of 2007.  Shortly thereafter, Cell Rx failed an HSN

18 | quality control inspection, and the product was never sold to HSN, or through HSN to end

19 | users.  Redekopp never reversed the outstanding receivable on ICTV's books despite his

20 | knowledge that the product was faulty and could not be sold through HSN.

21 |      32.    ICTV reported inflated revenue for the fourth quarter of 2007 in its Form 10-K

22 | for 2007 that included the Cell Rx "sale."  As with the other transactions, revenue recognition

23 | was improper because under GAAP no sale had occurred.

24 | *The December 21, 2007 Transaction*

25 |      33.    Following the recognition of the CellRx "sale" in November 2007, Redekopp

26 | sent an e-mail to ICTV executives in mid-December 2007 that indicated ICTV's fourth

27 | quarter sales were "not pretty" and suggested ways to improve the situation.  Included was a

28 | recommendation to "get HSN to acknowledge the units we've transferred into their packaging

SEC v. REDEKOPP
COMPLAINT

-7-

SECURITIES AND EXCHANGE COMMISSION
44 MONTGOMERY STREET, SUITE 2600
SAN FRANCISCO, CA 94104
TELEPHONE: 415-705-2500

1  before Dec 31. . . . HSN HAS to acknowledge it as a payable to us...auditors will send

2  confirmation directly to them." ICTV executives then discussed, at Redekopp's suggestion,

3  obtaining a traditional purchase order from HSN.

4      34.     On December 21, ICTV obtained a purchase order for 20,000 Derma Wand

5  units at the cost of $990,000. Redekopp knew that the 20,000 units would not be sold by

6  HSN until at least two quarters later. Indeed, the purchase order itself indicated a shipping

7  date to HSN of April 1, 2008. Nevertheless, Redekopp recognized the entire $990,000 as a

8  sale as of December 21, 2007. Ultimately, the product requested in the December 21

9  purchase order was not shipped to HSN. Rather, ICTV shipped product to HSN's end users

10 via the drop-ship arrangement as those customers placed their orders.

11     35.     As a result of Redekopp's fraudulent accounting for the CellRx transaction and

12 the December 21, 2007 transaction, ICTV overstated net sales and net income for the 12-

13 month-period ended December 31, 2007 by $1,084,000 (or 10.6%) and $717,000 (or 95%),

14 respectively.

15 *The June 30, 2008 Transaction*

16     36.     Despite growing anxiety over the fact that HSN had not sold through the units

17 recognized in December 2007, Redekopp recognized yet another 20,000-unit purchase order

18 as a "sale" shortly before his departure from the Company. In late June 2008, just weeks after

19 HSN had sold through the December 2007 units, ICTV obtained another 20,000-unit purchase

20 order from HSN. On the final day of the quarter, even though HSN had not sold any of the

21 requested units, Redekopp recognized the entire sale for $990,000. Once again, the product

22 was never shipped to HSN and was ultimately sold under the drop-ship arrangement after

23 quarter-end.

24     37.     As a result of Redekopp's fraudulent accounting for the June 30, 2008

25 transaction, ICTV overstated net sales by 46% for second quarter 2008 on originally reported

26 net sales of $3.1 million. In addition, ICTV's originally reported net income of approximately

27 $469,000 for the period was restated to a net loss of approximately $224,000.

28

**4.   Redekopp Repeatedly Misrepresented the Extent to Which ICTV's Auditors
Had Approved His Revenue Recognition Practices**

38.   As a further indication of Redekopp's scienter, Redekopp made multiple misrepresentations regarding the extent to which ICTV's outside auditors had approved his revenue recognition practices.

39.   In the fall of 2007, as ICTV attempted to secure financing from Wells Fargo, Redekopp was repeatedly questioned by a Wells Fargo finance officer regarding ICTV's revenue recognition practices for its sales through HSN.

40.   On multiple occasions, Redekopp indicated to the Wells Fargo finance officer that ICTV's auditors were fully satisfied with ICTV's revenue recognition practices relating to the HSN sales.

41.   In fact, at the time of his response, Redekopp had not spoken to ICTV's auditors regarding ICTV's revenue recognition practices for HSN sales.

42.   Similarly, when ICTV hired a new Chief Operating Officer in 2008, Redekopp provided inconsistent explanations of ICTV's recognition practices, and falsely assured the COO that ICTV's revenue recognition practices for the HSN sales were approved by ICTV's auditors.

**5.   Redekopp's Improper Accounting For HSN Sales Misled the Investing Public**

43.   As a result of Redekopp's improper accounting for HSN sales, ICTV reported materially inflated revenue and net income to investors and to the Commission on Forms 10-Q and 10-K from the first quarter of 2007 through the second quarter of 2008.  Investors determining whether to buy or sell ICTV stock were thus basing their decisions on false information about ICTV's financial performance.

44.   In each filing, Redekopp falsely certified that he had reviewed the Form 10-Q or 10-K and that it did not contain any untrue statements of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading.

45.   Redekopp also made false and misleading representations to a third party investment fund that purchased ICTV shares in November 2007 as part of a private placement.

SEC V. REDEKOPP
COMPLAINT

-9-

SECURITIES AND EXCHANGE COMMISSION
44 MONTGOMERY STREET, SUITE 2600
SAN FRANCISCO, CA 94104
TELEPHONE: 415-705-2500

1  In the Securities Purchase Agreement, signed by Redekopp on ICTV's behalf, ICTV represented

2  that "[a]ll of the accounts receivable and net receivables of the Company are valid and

3  enforceable claims, are subject to no known set-off or counterclaim, and to the knowledge of the

4  Company are fully collectible in the normal course of business." Redekopp knew this statement

5  was false, because he knew that HSN's payment to ICTV was contingent upon sell-through.

6        46.     Redekopp knew or was reckless in not knowing that the statements in ICTV's

7  Forms 10-Q and 10-K were false and misleading because Redekopp, in his capacity as ICTV's

8  CFO, was directly responsible for recognizing the HSN sales that caused ICTV to overstate its

9  revenue over the six-quarter period. Redekopp also knew or was reckless in not knowing that

10  ICTV's revenue recognition practices violated GAAP.

11        **C. Redekopp Failed to Properly Recognize Revenue and Account for Returns for Its
             Direct Sales**
12

13        47.     Redekopp also failed to properly recognize revenue and returns for the

14  Company's direct sales (*i.e.*, sales made directly by ICTV to end users via infomercials),

15  resulting in a material overstatement of revenue from the second quarter of 2007 through the

16  second quarter of 2008.

17        48.     First, Redekopp improperly recognized revenue on direct sales prior to

18  customer acceptance. ICTV provided its direct sales customers a 30-day free trial period

19  whereby the customer could try the ordered product prior to purchase. ICTV billed customers

20  upon expiration of the 30-day period. Although ICTV did not bill customers until expiration

21  of the trial period, Redekopp recognized revenue upon shipment of the product, before

22  expiration of the trial period.

23        49.     Under GAAP, where a customer is given a trial or evaluation period for a

24  product, revenue cannot be recognized until the earlier of when the customer accepts the

25  product (as set forth in the contract with the seller or by affirmative acceptance) or the trial

26  period has expired. Because ICTV's direct sales customers did not accept the product prior to

27  expiration of the trial period, Redekopp's recognition of revenue was improper.

28

1    50.    Redekopp also improperly accounted for returns of product sold through the

2    Company's direct sales channels.  Redekopp failed to estimate and establish a return

3    allowance as required by GAAP, despite a disclosure in ICTV's financial statements stating

4    that "[t]he company provides an allowance for returns based upon past experience."  ICTV

5    also disclosed in its SEC filings a historical return rate of 11 to 17%, and Redekopp

6    anticipated 15% returns on direct sales.  However, Redekopp did not establish any return

7    allowance.  Instead, Redekopp recorded returns as they were received and wrote off returns

8    directly against current sales.

9    51.    In failing to establish an allowance and instead writing off returns directly

10   against current sales, Redekopp caused ICTV to overstate revenue on direct sales, for two

11   reasons.  First, the actual returns that Redekopp recorded were significantly underreported and

12   did not reflect the actual returns received.  Redekopp relied exclusively on return reports

13   received from ICTV's third-party fulfillment warehouse (which processed the direct sales and

14   returns).  However, as Redekopp knew, these reports were inherently flawed due in part to the

15   warehouse's methods for updating the reports.

16   52.    The second issue with Redekopp's accounting treatment, which compounded the

17   problem, was that ICTV failed to adhere to its stated 30-day return policy.  ICTV accepted

18   returns at any time, a practice Redekopp knew the Company made without exception.  Because

19   ICTV failed to adhere to its stated 30-day return policy and accepted returns beyond the 30-day

20   period, Redekopp's practice of recording actual returns caused ICTV to overstate its revenue by

21   failing to offset future returns.

22   53.    As a result of Redekopp's improper accounting practices for direct sales, ICTV

23   reported inflated revenue and net income in its Forms 10-Q for the second and third quarters

24   of 2007 and its Form 10-K for fiscal year 2007.  ICTV also reported inflated revenue in its

25   Forms 10-Q for the first and second quarters of 2008.

26   54.    Redekopp knew or was reckless in not knowing that the statements in ICTV's

27   Forms 10-Q and 10-K were false and misleading because Redekopp, in his capacity as ICTV's

28

1   CFO, was directly responsible for recognizing the direct sales and returns that caused ICTV to

2   overstate its revenue and net income for that period.

3       **D. ICTV Twice Restates Its Financial Statements**

4         55.     Redekopp resigned from ICTV on August 15, 2008. Shortly thereafter, ICTV's

5   Chief Operating Officer and new Director of Finance (now Chief Financial Officer) discovered

6   Redekopp's multiple improper accounting practices.

7         56.     On October 31, 2008, ICTV announced that it intended to restate its historical

8   financial statements for the fiscal year ended 2007 and the first two quarters of 2008 as a

9   result of improper revenue recognition. ICTV completed its filing of amended financial

10   statements in June 2009. The restatement included a $1.4 million reduction in 2007 revenue

11   related to the HSN errors, and an $840,000 reduction in 2007 revenue related to the failure to

12   properly record direct sales returns. ICTV also reduced 2008 revenue by an additional

13   $840,000 due to the direct sales returns issue.

14         57.     In April 2010, ICTV again restated its financial statements for the fiscal year

15   ended 2007. The restatement included an additional $550,000 revenue reduction related to

16   the premature recognition of direct sales revenue prior to expiration of a free trial period.

17         58.     The following table reflects that the accounting errors were material to the

18   Company's financial statements:

| Period | Originally Reported Net Sales | Adjustment to Net Sales | Restated Net Sales | Percentage Overstatement (Under) |
|---|---|---|---|---|
| FY 2007 | $11,324,000 | ($2,836,000) | $8,488,000 | 33% |
| 1Q 2008 | $3,669,000 | $197,000 | $3,866,000 | (5%) |
| 2Q 2008 | $4,282,000 | ($1,077,000) | $3,205,000 | 34% |

59.     Additionally, in all periods all originally reported net income was negated and

restated to a net loss as follows:

| Period | Originally Reported Net Income | Restated Net (Loss) | Reduction to Reported Net Income |
|---|---|---|---|
| FY 2007 | $1,475,775 | ($1,081,988) | ($2,557,763) |
| 1Q 2008 | $109,980 | ($164,773) | ($274,753) |
| 2Q 2008 | $260,298 | ($862,399) | ($1,122,697) |

SEC v. REDEKOPP
COMPLAINT
-12-
SECURITIES AND EXCHANGE COMMISSION
44 MONTGOMERY STREET, SUITE 2600
SAN FRANCISCO, CA 94104
TELEPHONE: 415-705-2500

# FIRST CLAIM FOR RELIEF

*Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder*

60.     The Commission realleges and incorporates by reference Paragraphs 1 through 59.

61.     By engaging in the conduct described above, Redekopp, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or of the mails, with scienter:

      (a)     employed devices, schemes, or artifices to defraud;

      (b)     made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

      (c)     engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

62.     Redekopp has violated and, unless restrained and enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5].

# SECOND CLAIM FOR RELIEF

*Violations of Section 17(a)(1) of the Securities Act*

63.     The Commission realleges and incorporates by reference Paragraphs 1 through 59.

64.     By engaging in the conduct described above, Redekopp, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails, with scienter, employed devices, schemes, or artifices to defraud.

1    65.    By reason of the foregoing, Redekopp violated and, unless restrained and

2    enjoined, will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C.

3    § 77q(a)(1)].

4                          **THIRD CLAIM FOR RELIEF**

5                 *Violations of Section 17(a)(2) and 17(a)(3) of the Securities Act*

6    66.    The Commission realleges and incorporates by reference Paragraphs 1 through

7    59.

8    67.    By engaging in the conduct described above, Redekopp, directly or indirectly,

9    in the offer or sale of securities, by use of the means or instruments of transportation or

10   communication in interstate commerce or by use of the mails, obtained money or property by

11   means of untrue statements of material fact or by omitting to state a material fact necessary in

12   order to make the statements made, in light of the circumstances under which they were made,

13   not misleading, and engaged in transactions, practices, or courses of business which operated

14   or would operate as a fraud or deceit upon purchasers.

15   68.    By reason of the foregoing, Redekopp has violated and, unless restrained and

16   enjoined, will continue to violate Sections 17(a)(2) and 17(a)(3) of the Securities Act [15

17   U.S.C. § 77q(a)(2) and (3)].

18                          **FOURTH CLAIM FOR RELIEF**

19              *Aiding and Abetting Violations of Section 13(a) of the Exchange Act and*
                          *Rules 12b-20, 13a-1, and 13a-13 thereunder*
20

21   69.    The Commission realleges and incorporates by reference Paragraphs 1 through

22   59.

23   70.    ICTV filed with the Commission quarterly and annual reports on Forms 10-Q

24   and 10-K that contained untrue statements of material fact and omitted to state material

25   information required to be stated therein or necessary in order to make the required statements, in

26   the light of the circumstances under which they were made, not misleading, in violation of

27   Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder.

28

1    71.    Through the conduct alleged above, Redekopp knowingly provided substantial

2   assistance to ICTV in its violations of Section 13(a) of the Exchange Act and Rules 12b-20,

3   13a-1, and 13a-13 thereunder, and therefore is liable as an aider and abettor pursuant to

4   Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

5    72.    Redekopp has aided and abetted and, unless restrained and enjoined, will

6   continue to aid and abet violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)]

7   and Rules 12b-20, 13a-1, and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13]

8   thereunder.

9   **FIFTH CLAIM FOR RELIEF**

10   *Aiding and Abetting Violations of Section 13(b)(2)(A) of the Exchange Act*

11    73.    The Commission realleges and incorporates by reference Paragraphs 1 through

12   59.

13    74.    ICTV failed to make and keep books, records, or accounts which, in reasonable

14   detail, accurately and fairly reflected its transactions and dispositions of its assets, in violation

15   of Section 13(b)(2)(A) of the Exchange Act.

16    75.    Through the conduct alleged above, Redekopp knowingly provided substantial

17   assistance to ICTV in its violations of Section 13(b)(2)(A) of the Exchange Act, and therefore

18   is liable as an aider and abettor pursuant to Section 20(e) of the Exchange Act [15 U.S.C.

19   § 78t(e)].

20    76.    Redekopp has aided and abetted and, unless restrained and enjoined, will

21   continue to aid and abet violations of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C.

22   § 78m(b)(2)(A)].

23   **SIXTH CLAIM FOR RELIEF**

24   *Aiding and Abetting Violations of Section 13(b)(2)(B) of the Exchange Act*

25    77.    The Commission realleges and incorporates by reference Paragraphs 1 through

26   59.

27

28

78.     ICTV violated Section 13(b)(2)(B) of the Exchange Act, which obligates issuers of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] to devise and maintain a sufficient system of internal accounting controls.

79.     Through the conduct alleged above, Redekopp knowingly provided substantial assistance to ICTV in its violations of Section 13(b)(2)(B) of the Exchange Act, and therefore is liable as an aider and abettor pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

80.     Redekopp has aided and abetted and, unless restrained and enjoined, will continue to aid and abet violations of Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)].

## SEVENTH CLAIM FOR RELIEF

*Violations of Section 13(b)(5) of the Exchange Act*

81.     The Commission re realleges and incorporates by reference Paragraphs 1 through 59.

82.     Through the conduct alleged above, Redekopp knowingly circumvented ICTV's system of internal accounting controls, and knowingly falsified ICTV's books, records, and accounts.

83.     Redekopp has violated, and unless restrained and enjoined, will continue to violate Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)].

## EIGHTH CLAIM FOR RELIEF

*Violations of Rule 13b2-1 under the Exchange Act*

84.     The Commission re realleges and incorporates by reference Paragraphs 1 through 59.

85.     Through the conduct alleged above, Redekopp directly and indirectly falsified and caused to be falsified ICTV's books, records, and accounts.

86.     Redekopp has violated, and unless restrained and enjoined, will continue to violate Rule 13b2-1 under the Exchange Act [17 C.F.R. § 240.13b2-1].

SEC v. REDEKOPP
COMPLAINT
-16-
SECURITIES AND EXCHANGE COMMISSION
44 MONTGOMERY STREET, SUITE 2600
SAN FRANCISCO, CA 94104
TELEPHONE: 415-705-2500

## NINTH CLAIM FOR RELIEF

*Violations of Rule 13a-14 under the Exchange Act*

87.     The Commission re realleges and incorporates by reference Paragraphs 1 through 59.

88.     Redekopp signed, as ICTV's principal accounting officer, false certifications pursuant to Rule 13a-14 of the Exchange Act that were included in ICTV's fiscal 2007 annual report filed on Form 10-K, as well as its quarterly reports filed in fiscal 2007 and fiscal 2008.

89.     In the certifications included with the annual and quarterly reports, Redekopp falsely stated, among other things, that the reports fully complied with the requirements of Section 13(a) or 15(d) of the Exchange Act and that information contained therein fairly presented in all material respects the financial condition and result of operations of ICTV. Redekopp also falsely stated in the certifications, among other things, that: (a) each report did not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading; (b) the financial statements, and other financial information included in the report, fairly presented in all material respects the financial condition, results of operations, and cash flows of ICTV as of, and for, the periods presented in the report; and (c) he had disclosed to ICTV's auditor and audit committee all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting and any fraud, whether or not material, that involved management or other employees who had a significant role in ICTV's internal control over financial reporting.

90.     By reason of the foregoing, Redekopp has violated and, unless restrained and enjoined, will continue to violate Exchange Act Rule 13a-14 [17 C.F.R. § 240.13a-14].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

I.

Issue an order permanently enjoining Redekopp from violating Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)], Sections 10(b) and 13(b)(5)

SEC V. REDEKOPP
COMPLAINT
-17-
SECURITIES AND EXCHANGE COMMISSION
44 MONTGOMERY STREET, SUITE 2600
SAN FRANCISCO, CA 94104
TELEPHONE: 415-705-2500

1  of the Exchange Act [15 U.S.C. §§ 78j(b) and 78m(b)(5)], and Rules 10b-5, 13b2-1, and 13a-

2  14 thereunder [17 C.F.R. §§ 240.10b-5, 240.13b2-1, and 240.13a-14], and from aiding and

3  abetting violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act [15

4  U.S.C. §§ 78m(a), 78m(b)(2)(A), and 78m(b)(2)(B)] and Rules 12b-20, 13a-1, and 13a-13 [17

5  C.F.R. §§ 240.12b-20, 240.13a-1, and 240.13a-13] thereunder.

6                                         II.

7        Order Redekopp to pay civil monetary penalties pursuant to Section 20(d) of the

8  Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C.

9  § 78u(d)].

10                                        III.

11       Issue an order prohibiting Redekopp, pursuant to Section 20(e) of the Securities Act

12  [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], from

13  serving as an officer or director of any entity having a class of securities registered with the

14  Commission pursuant to Section 12 of the Exchange Act [15 U.S.C. §78*l*] or that is required

15  to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78*o*(d)].

16                                        IV.

17       Retain jurisdiction of this action in accordance with the principles of equity and the

18  Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders

19  and decrees that may be entered, or to entertain any suitable application or motion for

20  additional relief within the jurisdiction of this Court.

21                                         V.

22       Grant such other and further relief as this Court may determine to be just and necessary.

23  Dated: August 9, 2010                    Respectfully submitted,

24

25

26                                          Jason M. Habermeyer

27                                          Attorney for Plaintiff
                                            SECURITIES AND EXCHANGE
28                                          COMMISSION